# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

Nos. 04-1978 & 05-1033

ROGER WHITMORE'S AUTOMOTIVE
SERVICES, INC., and ROGER WHITMORE,

*Plaintiffs-Appellants,*

v.

LAKE COUNTY, ILLINOIS, GARY DEL RE,
SHERIFF OF LAKE COUNTY, GARY STRYKER,
UNDERSHERIFF OF LAKE COUNTY,
and CITIZENS TO ELECT GARY DEL RE,

*Defendants-Appellees.*

————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 2504—**Samuel Der-Yeghiayan**, *Judge.*

————————

ARGUED NOVEMBER 8, 2004—DECIDED SEPTEMBER 22, 2005

————————

Before BAUER, EASTERBROOK, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Towing operator Roger Whitmore and his company sued Gary Del Re, Gary Stryker, and others for violation of the Racketeer Influenced Corrupt Organization Act (RICO) and for retaliation based on constitutionally protected speech. The district court granted summary judgment to the remaining defendants on all counts and, later, granted motions for attorneys' fees and awarded costs. The plaintiffs appeal both the summary

judgment and the award of fees. We affirm the order granting summary judgment on the merits. As to the award of fees, we affirm in part, reverse in part, and remand to the district court for further proceedings.

## I. History

Large municipalities make extensive use of towing services to deal with stranded vehicles, accidents, and the like. The towing fees can be quite expensive for motorists and profitable to the companies furnishing the tow trucks. Since at least 1968, the Lake County, Illinois, Sheriff's Department has implemented a system that spreads this wealth among certain of the county's towing operators. The department maintains a list of "approved" towers, each of which is assigned a particular territory within the county. When the department requires the services of a tow truck, the sheriff's dispatcher calls the towing company of the vehicle operator's choice; if no tower is specified, the dispatcher calls the listed tower whose territory includes the location of the vehicle in question.

The various Lake County sheriffs implementing this system over the years have done so without the benefit of any local ordinances or written procedures, guidelines, or rules to govern the selection of which towing companies receive a spot on the list and an assigned territory. These assigned towing areas are occasionally redrawn and towers added or removed from the list, particularly following elections. From 1997-1999, there were about a dozen towers on the list.

Roger Whitmore ("Roger[1]"), president of Roger Whitmore's Automotive Services, Inc. ("Roger's"), operates a listed

---

[1] Both parties use this convention, so we shall follow suit for simplicity's sake. In addition, "Roger" denotes both plaintiffs— the person and the corporation—collectively.

towing service that has done work for the sheriff's department since 1972. In 1980, Roger's was allocated a specific towing territory in the northeastern corner of Lake County and retained that area with some adjustments through at least 1999. According to Roger, inclusion on the list does not come cheap. Three different sheriffs had, over the years, personally visited Roger in order to sell tickets for political fund raisers. For example, Sheriff Thomas Brown made personal appearances at Roger's with tickets in hand. Sheriff Mickey Babcox came to Roger's, placed fund-raiser tickets on the counter, and collected checks from Roger. Sheriff Clinton Grinnell did likewise. Sheriff's deputies often followed up these visits, to pick up checks or to verify that Roger would be attending the fund raisers.

Roger felt pressured to purchase the tickets for several reasons. For one, the officers appeared at Roger's business openly displaying badge and gun. Plus, Roger had heard rumors that a towing company refusing to purchase tickets had found itself "kicked off" the approved list. Roger therefore felt intimidated and concluded that he had no choice but to purchase the tickets, because otherwise "maybe they would take [his] business away." Even when some sheriffs mailed tickets, rather than making personal appearances, Roger felt "slightly uncomfortable." Until 1998, Roger always supported the incumbent sheriff during elections.

### A. Del Re's Campaign for Sheriff

In 1996, Sheriff Grinnell retired, and the county board appointed Undersheriff Gary Del Re as Grinnell's replacement for the remainder of the term. When Del Re assumed the helm as Grinnell's replacement, he delegated responsibility for all towing matters to Gary Stryker, his replacement as undersheriff. In 1997, Del Re kicked off a campaign to be elected sheriff in his own right. Del Re duly formed a

campaign committee that included Stryker and several others. The committee was officially in charge of obtaining campaign contributions for Del Re and for filing all required disclosure forms. Del Re also enlisted the services of Tom Crichton, a real estate broker, who had extensive experience (including fund raising) in various political campaigns in Lake County and statewide.

During the campaign, Crichton introduced Del Re, who was relatively new to Lake County, to various business owners in the county. The parties dispute whether Del Re's meet-and-greets were for the purpose of soliciting campaign funds.[2] Of the businesses Del Re visited, only three of them

---

[2] Of course, we construe all facts and draw all reasonable inferences in Roger's favor. *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). We take this opportunity, however, to note that Roger repeatedly violated Local Rule 56.1 of the Northern District of Illinois in the manner in which he contested summary judgment in the court below. As we have often pointed out, L.R. 56.1 and similar rules assist the district court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) (citation omitted). It is not the duty of the district court to scour the record in search of material factual disputes, nor is it ours. *See Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir. 1998); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in" the record.).

Roger took the wrong approach—in several egregious examples, Roger denies certain of the defendants' factual assertions by citation to all 244 paragraphs of his own statement of facts. Roger also repeatedly responds to factual assertions with conclusory allegations that the statements are "fabrications." Needless to say, this does not cut it. It is true, as Roger blithely reminds us, that this court's duty is to review the entire record.

(continued...)

were towing operators—Ray's Shell, A-Tire, and Max Johnson's Auto Center. Johnson's was a used car dealership that provided the sheriff's department with a number of vehicles for use in undercover investigations. Johnson's was also a backup tower for the sheriff's department and not on the approved list.

Roger initially supported Del Re's campaign for sheriff. In February 1998, however, Roger decided to switch his support to Willie Smith, Del Re's challenger in the primary election. Roger's change of heart came about following a conversation with another towing operator, Ernie Vole. Vole passed on a rumor that Wildwood Towing Service "had the ear of Sheriff Del Re" and was working to exclude Roger's from a new towing area coming open due to an operator being dropped from the list. According to the rumor, Del Re had planned to split the new territory between Roger's and Wildwood, but Wally Herman, Wildwood's owner, convinced Del Re to "screw" Roger's and give Wildwood the entire territory.

Shortly after his conversation with Vole, Roger contacted Undersheriff Stryker and asked about the rumors. Stryker denied them as "nonsense," but Roger was not convinced. He also believed that Willie Smith had a decent shot of winning the election and would be more accessible than Del Re, who, Roger believed, didn't "like to return his phone

---

[2] (...continued)

But *de novo* review does not mean that we must make and support the parties' arguments for them, even if the district court did not take Roger to task for failure to follow L.R. 56.1. It is the parties' duty to package, present, and support their arguments, and we shall not waste our time searching in vain for a dispute of material fact if we come across a factual contention or denial not adequately supported in the record by citation to admissible evidence. *Cf. Albrechtsen v. Bd. of Regents of the Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002).

calls and stuff like that." Thereafter, Roger attended several fund raisers for Smith. Smith promised Roger that he would be "fair" in towing area distributions, which Roger interpreted to mean that Smith would "divvy" the new towing area between Roger's and Wildwood. Roger donated $500 to Smith for his primary challenge. Roger also lent Smith a van from his shop at no charge for use in campaigning. A-Tire and Ernie's Wrecker Service (owned by Vole), both on the approved list, also supported Smith and donated money to his primary campaign ($1000 and $500, respectively).

Later, Roger informed Undersheriff Stryker that he and his brother Randy (who owned Whitmore's Service, another approved tow operator) had decided to support Smith. Stryker expressed disappointment with the brothers' decision.

Unfortunately for Smith and his backers, however, Del Re won the primary election in April 1998. Shortly thereafter, in June 1998, Roger donated $250 to Del Re's general election campaign. Other Smith backers, including A-Tire, Ernie's Wrecker Service, and Roger's brother, did likewise, contributing various sums. Del Re went on to win the general election in November of 1998, and towing matters proceeded as normal for the remainder of 1998. Roger's continued to tow for the sheriff's department as it had before, and for a while, Roger did not notice any difference in the way his company was being treated by the department.

### B. Del Re's Modification of Towing Areas

Sometime in early 1999, Del Re decided to change the towing boundaries. Del Re discussed his decision with Stryker and brought up the possibility of having Max Johnson do some towing for the department. During Del Re's campaign, Johnson had spoken to Crichton to ask how he might receive towing referrals from the department. The

parties dispute whether Johnson contacted the sheriff's department directly to request a towing area, or if he spoke only with Crichton. At any rate, Del Re decided to include Johnson on the list. Del Re ordered one of his deputies to inspect Johnson's Auto Center as soon as possible to ensure that it met all the requirements of the Illinois Vehicle Code.

When devising the new towing boundaries, Stryker split off part of Roger's territory to give to Johnson because his business was located within Roger's geographic area, and Roger's received substantially more calls than most of the towers on the list. In April 1999, upon Del Re's approval of Stryker's plan, the sheriff's department sent letters to each of the twelve towers on the list advising them of the changes. The letter stated that the department planned to "slightly modify" assigned territories in order to "maintain organizational efficiency."

As a result of the new plan, at least five of the towers experienced changes in their towing boundaries. Roger believed that his business suffered "significant loss" of territory due to the split with Johnson. Ernie's Wrecker Service picked up all of Illinois Route 60, whereas before it had only isolated portions of the roadway. A-Tire's boundaries changed "slightly" or not at all. Randy, Roger's brother, lost a busy intersection. The areas of other listed towers, including H&H Towing, Snyder's, and Wildwood, were modified slightly or remained the same.

### C.  Del Re's Fund Raising

Unlike his predecessors, Del Re established a policy that no uniformed officers could solicit campaign contributions; instead, he solicited the purchase of fund-raiser tickets through the mail. All told, Del Re received $11,585 in campaign contributions from towing operators, out of about $88,500 in total contributions to his primary and general election campaigns.

After winning the general election, Del Re carried considerable campaign debt. In late summer of 1999, Crichton formulated a plan to raise money to pay off Del Re's campaign debt. After consultation with Stryker, Crichton planned a fund-raising event for that purpose. Crichton broached the idea with towing operators Fred Moser, Ed Kohlmeyer, and Wally Herman. Four towing companies on the approved list—A-Tire, Johnson's Auto Center, Wildwood, and Ray's Shell—contributed to the fund raiser. Kevin's Towing, a company not on the approved list, donated $2000 to Del Re's campaigns.

### D. Roger's Lawsuit

Roger was dissatisfied with Del Re's new towing plan, believing that it had an adverse effect on his business. In April 1999, within weeks of receiving Del Re's new plan, Roger and his company filed a two count complaint against Lake County and Del Re seeking damages and injunctive relief pursuant to 42 U.S.C. § 1983 for alleged retaliation by Del Re for Roger's support of Smith in the primary election. On April 7, 2000, the plaintiffs filed an amended complaint adding Stryker, Del Re's campaign committee, Crichton, and a host of Roger's rival towing operators. The amended complaint also added various RICO and fraud claims. The plaintiffs later filed a second amended complaint further refining the RICO allegations and dropping several defendants.

After several rounds of dismissals weeded out various parties and claims, the plaintiffs had remaining a handful of claims against a few defendants—most important for our purposes, two RICO counts against Del Re and Stryker and two retaliation claims brought under § 1983 against Del Re. In March 2004, the district court granted summary judgment in the defendants' favor on all remaining counts. The defendants also filed a motion for attorneys' fees pursuant

to 42 U.S.C. § 1988, which the district court granted. Roger appeals the grant of summary judgment in Del Re and Stryker's favor, as well as the grant of attorneys' fees.[3]

## II. Discussion

Roger devotes much, if not most, of his briefs and argument to an extensive critique of the district court's memorandum opinion. It is the district court's judgment that we review, however, and we do so *de novo. See Corley v. Rosewood Care Ctr., Inc.*, 388 F.3d 990, 1001 (7th Cir. 2004). We view the facts and make all reasonable inferences therefrom in the light most favorable to the nonmoving party, Roger. *Id.* Summary judgment is appropriate if the record as a whole reveals no genuine issue of material fact for trial, and the moving party therefore is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Thus, summary judgment is not appropriate if a dispute about a material fact is "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must offer something more than a "scintilla" of evidence to overcome summary judgment, *see id.* at 252, and must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The gravamen of Roger's complaint is that Del Re and Stryker punished Roger for supporting Willie Smith in the primary race for sheriff. Roger also broadly alleges that Del

---

[3] This is a consolidated appeal of the district court's order granting summary judgment and the order awarding attorneys' fees to the defendants. The appeal of the attorneys' fees was submitted on the briefs.

Re and Stryker operated a corrupt "pay-for-play" system for towing in Lake County, in which the defendants intimidated towing operators into donating money to Del Re's campaign to remain on the towing list and solicited bribes from towing operators seeking to buy a spot on the approved list. In sum, Roger's legal claims are that: (1) Del Re retaliated against Roger for exercising his constitutional right to support the political candidate of his choice (counts 7 and 8), and (2) the defendants accepted bribes, engaged in extortion, and otherwise acted corruptly in violation of RICO (counts 3 and 4). We take these arguments in turn.

### A.  Retaliation Claims

Roger brings his retaliation claims pursuant to 42 U.S.C. § 1983, alleging that he was punished for exercising his free speech rights under the federal and Illinois constitutions. The legal basis for Roger's claims comes from companion Supreme Court decisions issued on the same day. *Bd. of County Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 688 (1996); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996). In both cases, the Court recognized the right of independent contractors not to be retaliated against by the government on the basis of their exercise of free speech, expression, or association.

*O'Hare* involved facts superficially similar to those before us in this case. O'Hare was a towing operator that, like Roger, was on a rotation list of available towers. *O'Hare*, 518 U.S. at 715. O'Hare had been on the list for nearly thirty years and its owner had an understanding that O'Hare would remain on the list as long as it provided good service. *Id.* Northlake's new mayor, elected in 1989, indicated that he was pleased with O'Hare's work and would continue using and referring its services. *Id.* Four years later, the mayor's reelection committee asked O'Hare's owner for a campaign contribution. *Id.* O'Hare's owner refused, however, and threw his support behind the mayor's

opponent. *Id.* Shortly thereafter, O'Hare was removed from the towing rotation list in retaliation for his stance during the campaign. *Id.* at 715-16.

O'Hare brought suit under § 1983, alleging that the retaliation violated his First Amendment right of political association. The district court dismissed O'Hare's complaint, and this court affirmed, because controlling caselaw at the time did not recognize that independent contractors enjoyed such a right. *See id.* at 716. The Court disagreed, however, concluding that O'Hare had stated a valid constitutional claim. *Id.* at 720-21. The Court held that independent contractors, like public employees, are protected against retaliation by public entities for their political beliefs, consistent with the principles set forth in prior free speech and political affiliation cases. *See id.* at 726; *see also id.* at 716-720; *Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968). The Court left open whether O'Hare's case should be governed by the *Elrod-Branti* line of cases, which governs political patronage and affiliation claims, or the *Pickering* line, which governs government employee free speech claims. *See O'Hare*, 518 U.S. at 726.

*Umbehr* involved facts less similar to ours: an independent contractor alleged that the defendant county commissioners terminated his contract in retaliation for his public criticism of the county and the board. *Umbehr*, 518 U.S. at 671. The Court concluded that summary judgment in the county board's favor was not appropriate and held, echoing *O'Hare*, that independent contractors may not be retaliated against for the exercise of protected expression. *Id.* at 673. Like the lower courts, the Court assumed that the plaintiff had in fact suffered retaliation and concluded that the *Pickering* rule was the appropriate test to evaluate the propriety of the government's actions. *See id.* at 675-80.

The principles set forth in the above-cited line of cases guide our analysis of Roger's retaliation claims. There is some uncertainty regarding which legal standard applies in political retaliation cases depending on whether the case involves political patronage or speech/affiliation. *See Heideman v. Wirsing*, 7 F.3d 659, 661-62 (7th Cir. 1993). As noted, even the Supreme Court in *O'Hare*, which was factually similar to this case, left this determination open on remand.

Regardless of which of these tests is the better fit, for a plaintiff to prevail in a political retaliation case, it is clear that two fundamental requirements must be satisfied: the expression at issue must be protected, and it must have brought about the retaliatory action complained of. *See Umbehr,* 518 U.S. at 675 ("The First Amendment[ ] . . . protects government employees from termination *because of* their speech on matters of public concern . . . . To prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination.") (emphasis in original, citation omitted); *Spiegla v. Hull*, 371 F.3d 928, 940-42 (7th Cir. 2004); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999); *Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir. 1998); *accord Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004); *Lucas v. Monroe County*, 203 F.3d 964, 973 (6th Cir. 2000). We may resolve Roger's retaliation claim in light of these two basic requirements, so this framework shall suffice for our purposes.

As to whether Roger's political support of Smith was constitutionally protected, the parties quibble over whether the support was for public or private purposes. The district court agreed with the defendants that Roger's support of Smith was for selfish reasons, because Roger "contribut[ed] to [Smith] hoping to get beneficial treatment by the newly elected Sheriff and thus benefit[ ] from the same type of alleged unlawful patronage that he alleges harmed him."

The record does seem to support the district court's conclusion that Roger's motives were less than pure, but that determination is irrelevant to this inquiry. We shall assume that Roger's campaign contributions themselves were expressions of protected political speech or affiliation, no matter what motives Roger may have had in making them. *E.g.*, *Buckley v. Valeo*, 424 U.S. 1, 16-19 (1976). So Roger satisfies the first requirement.

It is at the second requirement, however, where Roger's retaliation case founders. As noted, Roger must present an indication of a causal link between the protected act and the alleged retaliation—that the act was a substantial or motivating factor in the retaliation. *Cf. Umbehr*, 518 U.S. at 675. Although Roger's campaign support of Smith was constitutionally protected, Roger presents very little evidence that his political support for Smith was a substantial or motivating factor in the modification of his towing area. In fact, much of Roger's "evidence" is simply that his towing area changed at some point after he failed to support Del Re in the primary election. Beyond this, Roger points, for example, to the sheriff's department's lack of written guidelines for devising towing areas as evidence of Del Re's "opportunity" to punish dissenters like Roger and reward supporters. Roger claims that his brother Randy (who also supported Smith) lost a busy intersection under the new plan. Roger also points to Stryker being "upset" that Roger chose not to support Del Re in the primary, and he suggests that Del Re's use of the phrase "organizational efficiency" was nothing but a sham because some towers on the list did not lose territory.

This "evidence" does not carry the day for Roger. Indeed, it is almost as if Roger points to the *lack* of evidence as proof that his case should go to trial—the first time he failed to support an incumbent in a primary race, he suffered a loss in towing territory. As Roger sees it, the loss in territory, which occurred in April 1999, could only have

come as retaliation for supporting Smith in early 1998, and thus his case must proceed to trial. This is a classic *post hoc ergo propter hoc* logical fallacy, which might make the grade at the pleading stage. But to defeat summary judgment, Roger must present something by which a jury could connect the dots between the *propter* and the *post*, and at best he has presented only bare speculation or a scintilla of evidence, neither of which will suffice. *See, e.g.*, *Anderson*, 477 U.S. at 251-52; *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) ("[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial.") (emphasis in original).

On the record before us, we believe no rational jury could conclude that Del Re modified Roger's towing area in retaliation for Roger's support of Smith. Indeed, the record appears to contain ample evidence cutting against Roger's position. For example, we note the substantial lapse in time between Roger's support of Smith and the alleged retaliation—about fourteen months. Such a long stretch between the protected conduct and alleged retaliation significantly weakens any inference of a causal connection. *Cf. Wallscetti v. Fox*, 258 F.3d 662, 669 (7th Cir. 2001); *Hughes v. Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992).

In addition, Roger and his brother were not the only towing operators whose assigned areas changed under the new plan. The towing area for A-Tire, which donated even more money than Roger did to Willie Smith's primary campaign, was "modified slightly or not at all." The towing area of Ernie Vole, who donated to Smith and whose rumor mongering helped induce Roger to do likewise, actually *increased* under the new plan. Even Roger concedes that he was unaware of any retaliation these two towers may have suffered as a result of their support of Smith. As for his own towing area, Roger claims that the new plan

resulted in a "significant loss," though we note that undisputed evidence indicates that since 1999, Roger's ranked either second or third among all twelve listed towing companies in terms of volume of business generated by sheriff's department referral.

In any event, however Roger may measure the magnitude of his loss, he must show the required causal link. This he has not done, so this case is distinguishable from facially similar cases in which plaintiffs provided evidence of causation that precluded summary judgment. *See, e.g.*, *Lucas*, 203 F.3d at 975 (finding that the plaintiffs presented "overwhelming evidence that their removal from [a] tow call list was motivated by their constitutionally protected public criticism of the Sheriff's Department").

Finally, aside from the causation shortcomings noted above, Roger points to no local laws, regulations, or guidelines that require Sheriff Del Re to maintain a list of favored towing operators, let alone to do so in a prescribed fashion. Therefore, as long as Del Re did not act in a manner that offended towers' constitutional rights, he was free to add or remove them from the list as he saw fit. *Cf. O'Hare*, 518 U.S. at 725-26; *Kevin v. Thompson*, 235 F.3d 1026, 1027-28 (7th Cir. 2000) (collecting authority). Roger argues simply that his monthly towing volume (and therefore revenue) dropped, but that of course is consistent with the reduction in his towing area. He has not, however, shown that the reduction in towing area was improper—i.e., in retaliation for his protected expression. The fact that the Constitution extends some First Amendment protection to independent contractors like Roger does not mean that he enjoys some constitutional *guarantee* to a particular towing area.

For all of these reasons, the district court properly granted summary judgment on Roger's retaliation claims.

*B.  RICO Claims*

Roger's RICO claims purport violations of 18 U.S.C. §§ 1962(c) and 1962(d). We first tackle the § 1962(c) claims. To prove a violation of § 1962(c), a plaintiff must establish that there has been (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5).

Roger asserts that the enterprises in question are Del Re's election committee and the Lake County Sheriff's Department. He argues that the racketeering activity consists of the defendants' solicitation and acceptance of various contributions relating to Del Re's primary and general elections. In essence, Roger claims that the defendants enforced a corrupt "pay-for-play" system in which towers bribed their way onto the approved list or felt intimidated into making sizable campaign contributions so that Del Re would not take their business away. Roger alleges the following predicate acts in connection with defendants' scheme: (1) extortion in violation of the Hobbs Act, 18 U.S.C. § 1951; (2) mail fraud, 18 U.S.C. § 1341; (3) wire fraud, 18 U.S.C. § 1343; and (4) bribery and intimidation in violation of Illinois law, 720 Ill. Comp. Stat. 5/33-1 and 5/12-6.

At the outset, we note that it is far from clear that the defendants' deeds qualify as racketeering activity, particularly the alleged violations of the Hobbs Act. It is undisputed that the ultimate object of the alleged predicate acts was to raise money for Del Re's primary and general election campaigns. Campaign contributions, of course, are not in and of themselves illegal, and they reflect the nature of the American political system for better or worse. *E.g.*, *McCormick v. United States*, 500 U.S. 257, 272-74 (1991);

*United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001); *United States v. Allen*, 10 F.3d 405, 410-11 (7th Cir. 1993). Illinois law authorizes the sort of solicitation of campaign contributions at issue in this case. *See* 10 Ill. Comp. Stat. 5/9-1.4(2). Yet Roger claims that the defendants engaged in Hobbs Act extortion, defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).

In cases in which "color of official right" extortion is alleged, it can be difficult to separate above-board political contributions from the shady. *Cf. Giles*, 246 F.3d at 972 ("[C]ampaign contributions often are made with the hope that the recipient, if elected, will further interests with which the contributor agrees; there is nothing illegal about such contributions."). The Supreme Court therefore requires proof of a *quid pro quo*. *Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he [plaintiff] need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."); *Giles*, 246 F.3d at 972 ("To distinguish legal from illegal campaign contributions, it makes sense to require the [plaintiff] to prove that a particular contribution was made in exchange for an explicit promise or undertaking by the official."). For the other type of Hobbs Act extortion at issue—the fear-induced variety—the victim's fear must be reasonable. *See Sutherland v. O'Malley*, 882 F.2d 1196, 1202 (7th Cir. 1989).

For either type of extortion, Roger's evidence is woefully inadequate. Roger offers no objective evidence that the defendants were extorting the campaign funds from him or other towing operators. Instead, Roger merely points to evidence that Del Re accepted money from him and other towers (which, of course, is undisputed) and contends that the contributions could only have been in exchange for presence on the list or from fear of being removed from the

list. Roger relies heavily on subjective belief that the payments were a sort of *quid pro quo* or offered out of fear. For example, he offers the fact that towers made up a disproportionate percentage of Del Re's campaign contributions. He claims that the defendants received one contribution of cash in an envelope, and argues that Del Re violated his rule prohibiting face-to-face solicitation. Roger also testified to his discomfort at having sheriffs sporting guns and badges personally pick up contributions and cites isolated testimony from a fellow tower that "it helps" to make contributions to the incumbent sheriff. All of this, Roger contends, is proof that the defendants extorted funds from towers.

We do not believe a rational jury could find in Roger's favor on the basis of this evidence. For one, it should hardly be surprising that towers made up a disproportionate percentage of Del Re's campaign contributions, given the manner in which the Lake County sheriff's department has long used a list of approved towers. *Cf. Allen*, 10 F.3d at 411 ("It would be naive to suppose that contributors do not expect some benefit—support for favorable legislation, for example—for their contributions."). This is the very nature of politics, and in the absence of evidence indicating some wrongdoing independent of legal solicitation of campaign contributions, this proportional disparity is evidence of nothing. As stated, Illinois law expressly allows for solicitation of contributions like Del Re's, so merely accepting cash is not evidence of extortion, especially when there is no separate evidence of an explicit, promised *quid pro quo. See Evans*, 504 U.S. at 268; *cf. United States v. Martin*, 195 F.3d 961, 966 (7th Cir. 1999) (collecting authority).

Likewise, Roger's bald assertion that he and other towers had been intimidated does not carry the day. As noted, any fear that Roger or the others may have felt must be reasonable. This is where Roger's failure to present some objective evidence of extortion—for example, historical data tying the

award or denial of towing to contributions made or not made—becomes a serious problem for Roger's case. If a plaintiff's subjective discomfort with uniformed and armed law enforcement officers dropping by for contributions is enough to qualify as Hobbs Act extortion, it won't be long before all police fund raisers (for political or other purposes) come to an end. There must be objective evidence to indicate that the plaintiff's fears are reasonable and otherwise to allow a jury to find Hobbs Act extortion; we find none in this record to satisfy Roger's burden of establishing a material issue of fact for trial.

In any event, we need not delve into a discussion of whatever flaws there may be in the remaining predicate acts that allegedly amount to racketeering activity. Even if we generously assume that all of the remaining acts in question so qualify, Roger still must show a *pattern* of racketeering activity. The Supreme Court long ago made clear that the statutory definition of a pattern—two racketeering acts within ten years—did "not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). To establish a pattern of racketeering activity, a plaintiff must show continued criminal activity (or the threat thereof) and relationship between the predicate acts—a standard commonly dubbed the "continuity plus relationship" test. *See id.* at 239.

Relatedness of the alleged predicate acts does not pose a problem here. All of the acts complained of were indisputably for the purpose of raising funds for Del Re's primary and general election campaigns or paying off his campaign debt, so we shall assume that Roger meets the relationship prong. *See id.* at 240 (teaching that predicate acts are related if they have "the same or similar purposes, results, participants, victims, or methods of commission, or other-

wise are interrelated by distinguishing characteristics and are not isolated events") (citation omitted).

Roger does not, however, supply sufficient evidence to satisfy the continuity prong. As the Court has noted, continuity is "both a closed- and open-ended concept." *Id.* at 241. As its name suggests, a closed period of racketeering activity involves a course of criminal conduct that has ended. A plaintiff may demonstrate a closed period of continuity by proving a series of related predicates extending over a substantial period of time. *Id.* at 242. On the other hand, an open-ended period of racketeering is a course of criminal conduct that lacks the duration and repetition to establish continuity. A plaintiff may nevertheless satisfy continuity by showing past conduct that by its nature projects into the future with a threat of repetition. *See id.* To summarize, a RICO plaintiff can satisfy the continuity prong either by (1) demonstrating a close-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of conduct that, while short-lived, shows clear signs of threatening to continue into the future. *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992).

This court has analyzed continuity under a multifactor test, in which we consider (1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries. *See Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). No one factor is dispositive of a claim. *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990). Rather, our analysis of the continuity prong is fact-specific and undertaken with the goal of achieving a "natural and commonsense" result, consistent with Congress's concern with long-term criminal conduct. *See id.*; *see also Vicom,*

*Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) (citations omitted); *Sutherland*, 882 F.2d at 1204.

Analysis of the various factors present in this case leads us to conclude that Roger has not shown closed-ended continuity. As previously noted, Roger's RICO claim is against both Del Re and Stryker. The campaign contributions at issue spanned at most about two years—from 1997, when Del Re started off his campaign for sheriff, to 1999, when Del Re solicited donations to pay off his campaign debt. Perhaps the most important element of RICO continuity is its temporal aspect. *See, e.g.*, *Midwest Grinding Co.*, 976 F.2d at 1024. Although we have not employed a bright-line rule for how long a closed period must be to satisfy continuity, we have not hesitated to find that closed periods of several months to several years did not qualify as "substantial" enough to satisfy continuity. *See id.* (citing *H.J. Inc.* and collecting additional authority).

Likewise, the number of predicate acts alleged is not large. Roger points to several different instances of what he believes to be mail fraud—mailings of solicitations for purchase of fund-raising tickets and Del Re's notice to towers that the towing areas would be revised. Roger also claims that various phone calls between Johnson and Crichton and the department constituted wire fraud. Finally, Roger broadly asserts that the handful of face-to-face meetings between the defendants and some towing operators constituted bribery and intimidation. The fairly small number of predicate acts cuts against showing continuity, particularly when a large proportion of the acts involved wire or mail fraud, neither of which are favored means of establishing a RICO pattern in this circuit. *See Vicom*, 20 F.3d at 781 (collecting authority).

What is more, the victims of the defendants' activities were confined to a small group—the dozen or so approved towers from 1997 to 1999—which does not help Roger's case

for continuity. *Cf. W. Assocs. Ltd. v. Market Square Assocs.*, 235 F.3d 629, 635 (D.C. Cir. 2001) (distinguishing a single "set" of victims from a "class of victims who are all similarly and directly injured"). Most important, Roger alleges only one overarching scheme—that the defendants illegally obtained contributions to fund Del Re's election campaign. Although a RICO pattern may be established on the basis of a single scheme, "it is not irrelevant, in analyzing the continuity requirement, that there is only one scheme." *Sutherland*, 882 F.2d at 1204 (citing *H.J. Inc.*, 492 U.S. at 240); *U.S. Textiles, Inc. v. Anheuser-Busch Co.*, 911 F.2d 1261, 1269 (7th Cir. 1990). The campaign at issue was Del Re's first, and all of the predicate acts alleged were for the purpose of raising money for that campaign. There is no indication that the defendants engaged in any other racketeering scheme before or after that closed period associated with Del Re's campaign, or that there was a concurrent and unrelated scheme to use the campaign contributions for other purposes. Thus, the fact that we are faced with a single, isolated scheme with a confined set of victims also supports the conclusion that Roger has not shown closed-ended continuity, even if we generously assume that the alleged scheme brought about distinct injuries to the affected towers.

We also conclude that Roger has not established open-ended continuity. Instead of presenting meaningful evidence and argument on this score, Roger merely recites the legal standard for showing open-ended continuity and complains that the district court "did not credit material evidence as to pattern." Conclusory and unsupported allegations of this sort will not carry the day for Roger. *Cf. Vicom*, 20 F.3d at 783 ("A threat of continuity cannot be found from bald assertions. . . .").

In any event, schemes with a "clear and terminable goal have a natural ending point." *Id.* at 782. As discussed, Roger has alleged that defendants' scheme involved raising

funds for Del Re's 1998 campaign (both the primary and the general election) and retirement of its campaign debt. All of the predicate acts Roger alleged related to the solicitation of funds for the 1998 campaign. In this regard, Roger pleaded himself out of showing a continuing threat of continued activity, because the alleged scheme had a natural ending point when Del Re was elected sheriff and he retired the debt accrued in that campaign. *See id.*; *Olive Can*, 906 F.2d at 1151; *accord Hindes v. Castle*, 937 F.2d 868, 874 (3d Cir. 1991); *Int'l Bhd. of Teamsters v. Carey*, 297 F. Supp. 2d 706, 718 (S.D.N.Y. 2004), *aff'd sub nom.*, 124 Fed. Appx. 41 (2d Cir. 2005). Nor has Roger offered anything more than the unadorned allegation in his complaint that "the schemes were a regular . . . way the enterprises did business"; a generous review of the record does not indicate the existence of evidence to satisfy that aspect of open-ended continuity. *Cf. Vicom*, 20 F.3d at 784.

In sum, our review of the record supports the conclusion that Roger has not satisfied the continuity prong and thus has not presented evidence of a RICO pattern sufficient to survive summary judgment on his § 1962(c) claim. This is a "natural and commonsense" result, given the facts alleged and our analysis of the various continuity factors. *See, e.g.*, *U.S. Textiles*, 911 F.2d at 1269.

As for Roger's § 1962(d) claim, he again offers only his conclusory assertion that a conspiracy *must* be present, because the defendants' conspiratorial intent can be shown through circumstantial evidence—namely, the fact that the defendants were present "when illegal acts occur[red]." This is wholly inadequate. A conspiracy to violate RICO may be shown "by proof that the [defendant], by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes." *United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir. 1986) (citation omitted); *see also Gagan v. Am. Cablevision, Inc.*,

77 F.3d 951, 961 (7th Cir. 1996). The fact that defendants may have been physically present during commission of predicate acts, without more, is insufficient to defeat summary judgment on the § 1962(d) claim (indeed, such an expansive view would transform virtually all substantive RICO violations into conspiracies). Roger steers us to no specific evidence sufficient to raise a material issue of fact on this score, nor does our review of the record reveal such evidence. The district court properly granted summary judgment on Roger's § 1962(d) claim.

### C. Attorneys' Fees

At last, we turn to Roger's appeal of the district court's order awarding attorneys' fees.

Recall that the district court granted the defendants' motion for summary judgment in its entirety in March 2004. Thereafter, Lake County (which in March 2001 was dismissed from the action) and Del Re filed a motion for attorneys' fees pursuant to 42 U.S.C. § 1988 on the basis that Roger's suit was frivolous. The district court referred the issue to a magistrate judge, who recommended that Del Re be awarded $91,271.50 in fees, but that Lake County's claim be denied. The district court adopted the magistrate judge's recommendation with regard to Del Re, but dis-agreed with the recommendation regarding Lake County. On December 3, 2004, the district court entered an opinion and order awarding Lake County and Del Re $110,331.50 in fees and $4,154.74 in costs.

Section 1988 provides for the award of attorneys' fees to the prevailing party in a § 1983 action. 42 U.S.C. § 1988(b). Although the statute specifies the award of such fees is within the court's discretion, it is clear that prevail-ing defendants have a much harder row to hoe than do prevailing plaintiffs. *See Gonzalez v. Transfer Tech., Inc.*, 301 F.3d 608, 609 (7th Cir. 2002). A prevailing defendant

may be entitled to fees only in cases in which the plaintiff's action was frivolous, unreasonable, or groundless. *Cf. Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978); *see also Hughes v. Rowe*, 449 U.S. 5, 14-15 (1980) (extending *Christianburg*'s Title VII fee-shifting standard in the § 1983 context); *Khan v. Gallitano*, 180 F.3d 829, 837 (7th Cir. 1999); *Hamer v. County of Lake*, 819 F.2d 1362, 1367 (7th Cir. 1987). We have defined a suit as frivolous "if it has no reasonable basis, whether in fact or in law." *Tarkowski v. County of Lake*, 775 F.2d 173, 176 (7th Cir. 1985).

We review decisions awarding attorneys' fees for abuse of discretion, taking into consideration whether the district court properly applied the *Christianburg* standard and whether the court's findings are supported by the record. *Hamilton v. Daley*, 777 F.2d 1207, 1212 (7th Cir. 1985). Having done so, we cannot agree with the district court's conclusion that Roger's retaliation claims against Del Re were frivolous. *O'Hare* and *Umbehr* expanded First Amendment protection to cover independent contractors like Roger, and *O'Hare*'s facts are facially quite similar to those in this case. As our extensive discussion of Roger's claims on the merits indicates, Roger's theory of the case was not so lacking in reasonableness that it should be deemed frivolous and thus eligible for fee-shifting under § 1988. As to Roger's claims against Del Re, we cannot conclude that Roger's counsel failed to conduct a sufficient legal and factual investigation. *Cf. LaSalle Nat'l Bank of Chi. v. County of DuPage*, 10 F.3d 1333, 1340 (7th Cir. 1993). True, it was ultimately revealed that Roger's evidence established that his case was weak at best—so weak, in fact, that no triable issues of fact could be discerned and the defendants were entitled to summary judgment in the entirety. But a weak case does not a frivolous case make, so we must conclude that the district court abused its discretion with regard to the award of fees in Del Re's favor.

Matters become much trickier with regard to Lake County, however. Roger filed his original complaint pursuant to 42 U.S.C. § 1983 in April 1999, naming only Lake County and Sheriff Del Re as defendants and alleging deprivation of Roger's free speech rights, among other things. He later amended his complaint to state that "the County ceded all towing authority to Del Re, [Del Re] acted on behalf of the County regarding the matters set forth herein, and the County is responsible for his actions."

In August 2000, the defendants filed a motion to dismiss the complaint against it. In March 2001, Judge Gottschall, the district judge to whom the case was then assigned, granted the motion with respect to Lake County, among others, noting that the plaintiffs had conceded that the county was not a proper party defendant and admonishing that "[t]he court cannot imagine how plaintiffs can justify naming the county in these counts consistent with Rule 11." (R. 63 at 8.)

It was on this basis that the magistrate judge apparently concluded that Roger's suit against the county was frivolous. The magistrate judge did not, however, recommend an award of fees to the county because it failed to mitigate its losses. As noted, the district court disagreed with the magistrate judge's conclusion with regard to mitigation.

Under the deferential standard of review in play here, we cannot say that the district judge committed error when he concluded that the case against Lake County was frivolous, particularly in light of the reasoning of Judge Gottschall and the magistrate judge. At the time Roger filed his suit, under clearly established law, Lake County was not a proper party defendant under the apparent theory of joint or vicarious liability that Roger pleaded. *See Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 692 (1978); *Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995). Thus, Roger's claim against Lake County had no

reasonable legal basis. *See Tarkowski*, 775 F.2d at 176; *see also Hamer*, 819 F.2d at 1367 (noting that "it is the responsibility of counsel to know the law and to know whether a claim is clearly foreclosed by precedent") (citation omitted). Roger is not helped by the fact that later developments in the law clarified that Illinois counties may properly be pleaded as necessary parties in suits seeking damages against independently elected sheriffs like Del Re. *See Carver v. Sheriff of LaSalle County*, 324 F.3d 947, 948 (7th Cir. 2003). This clarification relates not to substantive liability of the sort Roger alleged, but instead addresses Illinois law that requires counties to bear financial responsibility for damages in such suits.

We therefore affirm the award of fees to Lake County, because we cannot say that the court's finding of frivolousness was an abuse of discretion. We note, however, that the district court provided only the most cursory explanation for its determination that the county had no need to mitigate its damages. *See Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1278 (7th Cir. 1984) (noting that district courts must provide clear explanations and make sufficient factual findings to assist appellate review); *cf. Leffler v. Meer*, 936 F.2d 981, 987 (7th Cir. 1991). Moreover, the court lumped together the fees awarded to both Del Re and the county, and it is not clear to us that the difference between the district judge's award of fees and the magistrate judge's award of fees accurately represents the county's share. On remand, the district court shall determine what reasonable attorneys' fees Lake County alone may be entitled to, and it should provide a reasoned explanation for its conclusions regarding mitigation or any other relevant issue bearing on the award of fees. *See id.*

Lastly, we note that the plaintiffs do not challenge the district court's award of costs to Del Re and Lake County; that portion of the court's order shall stand.

### III.  Conclusion

For the reasons stated, we AFFIRM the district court's order granting summary judgment in the defendants' favor. We REVERSE the award of fees in Del Re's favor and REMAND for a determination of the appropriate amount, if any, to be awarded to Lake County.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*