In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 05-1690

RONNY GAMBOA,

*Plaintiff-Appellee,*

*v.*

CARLOS VELEZ, Chicago Police Officer #20162,
R. RODRIGUEZ, Chicago Police Officer #20230,
PAUL LOPEZ, Chicago Police Officer #2001, et al.,

*Defendants-Appellants.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 219—**Paul E. Plunkett**, *Judge.*

———————

ARGUED MAY 12, 2006—DECIDED AUGUST 10, 2006

———————

Before MANION, KANNE, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* After a jury acquitted Ronny Gamboa of murder, Gamboa sued several Chicago police detectives under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq. He claimed that the detectives lied and otherwise conspired in their investigation and testimony to falsely accuse him and others of committing the murder. The detectives moved to dismiss, arguing that Gamboa had failed to state a RICO

claim. The district court denied the motion but allowed the detectives to pursue an interlocutory appeal. The officers then petitioned this court for permission to appeal, and we granted their petition. We now reverse.

## I.

In July 1997, Sindulfo Miranda was murdered in Chicago. The Chicago police department assigned detectives Alfonso Bautista, Paul Lopez, R. Rodriguez, and Carlos Velez to the case. As a result of the detectives' investigation, Ronny Gamboa was charged in November 1997 with murder and solicitation of murder for hire. Their investigation turned up evidence that Miranda was allegedly in a tavern owned by Gamboa on the night of his murder. Other evidence suggested that Gamboa allegedly solicited and participated in Miranda's kidnapping, beating, and murder. (Gamboa's supposed motive for killing Miranda is not readily apparent from the record before us.) In the face of these and similar allegations, Gamboa went to trial and was acquitted in August 2000.

Other defendants initially implicated in Miranda's murder were not so fortunate. The detectives' investigation linked Omar Aguirre, Robert Gayol, Luis Ortiz, and Duarte Santos to Gamboa and Miranda's murder. Aguirre was convicted of murder and sentenced to 55 years in prison. Gayol was convicted of murder and sentenced to life. Ortiz pleaded guilty to murder and received a 25-year sentence, and Santos pleaded guilty to a lesser charge, receiving a 12-year sentence. However, as the detectives now readily acknowledge, each of these convictions (even the guilty pleas) has been overturned. Apparently, Miranda's true killers have since been identified. *See United States v. Carman*, No. 02-CR-

464, 2004 WL 1638231, at *2 (N.D. Ill. July 16, 2004) (describing Miranda's brutal murder as part of a gang's attempt to steal some 1,000 kilograms of marijuana from Miranda).

All this and more prompted Gamboa to sue the City of Chicago and the four detectives responsible for his apparently erroneous prosecution. Filed in January 2003, his complaint led with a RICO claim under 18 U.S.C. § 1962(c). It also included counts under 42 U.S.C. § 1983, as well as state law claims of malicious prosecution and intentional infliction of emotional distress. On the City and detectives' motion, the district court dismissed the § 1983 and state law claims with prejudice on statute-of-limitations grounds. In addition, the district court dismissed the RICO count for failing to state a claim but did so without prejudice for Gamboa to file an amended complaint. Gamboa did file an amended complaint, with the § 1962(c) claim as the only count, and the City and detectives again moved to dismiss. While that motion was pending Gamboa agreed to dismiss the City from the case without prejudice.[1]

As to the detectives, the district court denied their second motion to dismiss, concluding that Gamboa's amended complaint sufficiently stated a RICO claim. The legal dispute here centered upon whether Gamboa adequately alleged a pattern of racketeering activity, an element of his RICO claim described in greater detail below. With respect to that issue, the detectives, at the district court's suggestion, filed a motion requesting permission to pursue an interlocu-

---

[1] Gamboa also named two private individuals as defendants, Luis Ortiz and Miguel LaSalle, each of whom implicated Gamboa in Miranda's murder. However, the district court dismissed Ortiz and LaSalle from the case without prejudice due to Gamboa's failure to serve them. *See* Fed. R. Civ. P. 4(m).

tory appeal under 28 U.S.C. § 1292(b). *See* Fed. R. App. P. 5(a)(3). The district court granted their request. The detectives then petitioned this court for permission to appeal, presenting the following question for review: "whether a single scheme that ends without indication that it will be repeated establishes a pattern of racketeering activity merely because the scheme occurs over several years, involves a variety of predicate acts, and targets more than one victim." We granted the detectives' petition.

## II.

Before tackling the interlocutory question presented by the detectives, we first review several fundamental points about stating a RICO claim under § 1962(c) and then further examine the pleading at issue in this appeal, i.e., Gamboa's amended complaint. The theory of Gamboa's claim is that the four detectives coordinated a scheme of widespread criminal misconduct to erroneously prosecute Gamboa, Aguirre, Gayol, Ortiz, and Santos for Miranda's murder and then cover it up. (To be clear, Gamboa is the only plaintiff in this action.) To advance his claim under § 1962(c), Gamboa characterizes the alleged misconduct as racketeering activity.

RICO, nonetheless, does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity. *See Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 633 (7th Cir. 2001) (emphasizing the habitual nature of the requisite criminal activity) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989)); *Midw. Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). In keeping with this limited purpose, there are four elements to a

§ 1962(c) claim: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Bressner v. Ambroziak*, 379 F.3d 478, 481-82 (7th Cir. 2004). To give the detectives fair notice of the claim against them and avoid dismissal under Fed. R. Civ. P. 12(b)(6), Gamboa "must . . . allege each of these elements to state a claim." *Sedima*, 473 U.S. at 496.

The only element disputed in this appeal is the third element—the pattern element. For this element to be satisfied, the alleged acts of wrongdoing must not only be related, but, important for purposes of this appeal, must "amount to or pose a threat of continued criminal activity." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1002 (7th Cir. 2004) (quoting *H.J. Inc.*, 492 U.S. at 239); *see also Roger Whitmore's Auto. Servs., Inc. v. Lake County*, 424 F.3d 659, 672-74 (7th Cir. 2005) (citing *H.J. Inc.*, 492 U.S. at 237-42). This is true whether the misconduct at issue is considered a "close-ended" scheme (a completed scheme that, by its duration, can carry an implicit threat of future harm) or "open-ended" scheme (a scheme that, by its intrinsic (e.g., business-as-usual) nature, threatens repetition and thus future harm). *See Roger Whitmore's*, 424 F.3d at 672-73; *Midw. Grinding*, 976 F.2d at 1022-23. Consequently, isolated instances of criminal behavior, not presenting at least some threat of future harm, cannot meet § 1962(c)'s continuity element. *See Roger Whitmore's*, 424 F.3d at 673-74; *Pizzo*, 258 F.3d at 633 (observing that "continuity" is a proxy in the language of the case law for frequent, habitual criminal conduct); *Midw. Grinding*, 976 F.2d at 1022-23.

In this case, the detectives maintain that Gamboa has not satisfied the continuity element because the allegations in his amended complaint—even when construed in his favor for Rule 12(b)(6) purposes—present only a

single, nonrecurring scheme (a frame-up of five individuals for a single murder), which, as alleged, does not carry any threat of continued criminal activity. Since the factual allegations in Gamboa's amended complaint are crucial to the question before us, we review those allegations in detail. For purposes of this discussion, we accept the amended complaint's allegations as true and draw all reasonable inferences therefrom in Gamboa's favor. *See Bressner*, 379 F.3d at 480.

The amended complaint begins by generally accusing the detectives of making false arrests, tampering with witness statements, procuring perjured testimony, committing perjury, and engaging in a malicious prosecution "in order to intimidate and retaliate against" one person, Gamboa. It further alleges that the detectives falsified police reports, coerced witnesses to testify against Gamboa and others falsely, and lied before a grand jury or in court "in an attempt to convict GAMBOA and others of the crime of murder and to keep him incarcerated, to cover up the false arrests of GAMBOA and others." The amended complaint defines the word "others" to mean Aguirre, Gayol, Ortiz, and Santos.

The amended complaint then moves to specifics, stating that Miranda was murdered in July 1997 and that Gamboa was arrested for and charged with Miranda's murder in November 1997. It also names the four detectives assigned to the Miranda murder investigation, Bautista, Lopez, Rodriguez, and Velez. The amended complaint then alleges that Rodriguez and Velez intimidated an individual named Miguel LaSalle into falsely stating that Miranda's kidnapping and beating took place in Gamboa's tavern at the direction and control of Gamboa. Elsewhere, the amended complaint alleges that LaSalle stated that Gamboa

solicited and participated in Miranda's murder and that the detectives used these statements knowing that they were false. Also, according to the amended complaint, the detectives coerced two individuals named Jose Chapa and Leticia Martinez into "giv[ing] false statements or . . . refus[ing] to testify to the truth" during the course of the investigation/prosecution. With respect to Chapa in particular, Rodriguez and Velez allegedly coerced him into falsely stating that he was with Miranda in Gamboa's tavern on the night of the murder. Additionally, Rodriguez and Velez allegedly intimidated Ortiz into falsely implicating Gamboa in Miranda's murder and further intimidated or offered inducements to Ortiz to testify falsely at Gamboa's trial. Ortiz's allegedly false testimony included statements that he was present in the tavern when the solicitation for murder occurred and while Miranda was kidnapped and beaten. More important, Ortiz also allegedly falsely stated that Gamboa solicited and participated in Miranda's murder. Similar statements were allegedly extracted from Aguirre and Santos.

Furthermore, Gamboa avers that the detectives prepared multiple reports based upon this allegedly false information in an attempt, according to the amended complaint, to cover up their false arrests of Gamboa and the others. Relatedly, the detectives allegedly ignored information that would have helped exonerate Gamboa. The amended complaint then claims that the purportedly false reports and statements led directly to Gamboa's prosecution and all the consequences that Gamboa suffered therefrom. Moreover, knowing that the charges against Gamboa were false, the detectives conspired, according to the amended complaint, for more than five years to cover up their intimidation of witnesses and other wrongdoing.

The amended complaint then turns to explaining the nature of the detectives' "racketeering activity," maintaining that they "illegally" worked to obstruct justice, to intimidate witnesses into committing perjury, to cover up their false arrests, and "to prosecute [Gamboa] for murder." It alleges that the detectives committed criminal offenses that included influencing a grand jury, obstructing a criminal investigation, obstructing state or local law enforcement, extorting witnesses to commit perjury to avoid prosecution or to induce false statements and testimony, obstructing justice generally, and tampering with a witness all purportedly in violation of 18 U.S.C. §§ 1503, 1510, 1511, and 1512. Arriving at the heart of the matter, the amended complaint then averred the following:

> Between July 1997 and December 2002, [the detectives] did the following acts as part of their continued criminal activity:
>
> a) knowingly prepared a false confession in November 1997, which implicated GAMBOA in the solicitation of murder for hire of Miranda and had Duarte Santos execute same;
>
> b) knowingly prepared a false confession in November 1997, which implicated GAMBOA in the solicitation of murder for hire of Miranda and had Omar Aguirre execute same;
>
> c) knowingly prepared a false confession in November 1997, which implicated GAMBOA in the solicitation of murder for hire of Miranda and had Luis Ortiz execute same;
>
> d) tendered the three false confessions to the Office of the Cook County States [sic] Attorney, which were used

to in part prosecute Santos, Aguirre, Ortiz, Robert Gayol, and [Gamboa] on murder charges;

e) prepared police reports between July and November 1997 and signed same, which contained knowingly false oral and written statements of Santos, Aguirre and Ortiz;

f) several weeks prior to [Gamboa's] trial in August, 2000 on murder charges, coerced Luis Ortiz to change his oral and written statements in order to create a witness who allegedly heard GAMBOA solicit the murder of Miranda and who witnessed GAMBOA participate in the beating and murder of Miranda. Ortiz was the only witness presented by the State at GAMBOA's murder trial who allegedly heard the solicitation for murder;

g) coerced Luis Ortiz to falsely testify against GAMBOA in an attempt to convict him on the charge of murder;

h) in the years 2001 and 2002, coerced Luis Ortiz to falsely testify that he saw Gayol burn Miranda alive in a car in order to obtain a murder conviction and life jail sentence for Gayol;

i) coerced the Office of the Cook County States [sic] Attorney to use the false statement of Omar Aguirre in two separate murder trials in 1988 [sic] and 1999 in order to convict him of the murder of Miranda and to sentence him to 55 years in jail;

j) on information and belief in the year 2002 provided their police reports containing the false statements and false confessions aforementioned to federal agents[;] thereafter failed and refused to advise the federal agents that the reports and statements contained false information[;]

       k) on information and belief have further refused to cooperate with federal prosecutors in subsequent prosecutions of the individuals who actually murdered Miranda in order to continue to cover up the preparation of false reports, preparation of false statements, perjury and intimidation.

Finally, the amended complaint concluded by recounting the injuries inflicted by the detectives' acts upon Gamboa, Aguirre, Gayol, Ortiz, and Santos and by requesting treble damages for Gamboa alone in excess of $10 million plus fees and costs.

The amended complaint reveals that the detectives' scheme, as alleged, had a limited purpose, distinct from the detectives' routine law enforcement duties. In places, the amended complaint alleges that the detectives sought to inflict a malicious murder prosecution upon Gamboa alone. Elsewhere, it alleges that the purpose of the detectives' criminal conduct was to frame Gamboa plus Aguirre, Gayol, Ortiz, and Santos for Miranda's murder. Even with the addition of the other alleged victims, the amended complaint cabins the detectives' alleged wrongdoing here to a one-time endeavor to wreak havoc upon all matters linked to a single murder investigation. Consequently, the criminal activity, as alleged, had a built-in end point: once the frame-up was put to rest, the scheme was over.[2] *Cf. Roger*

---

[2] As the district court properly noted, acts to conceal the underlying wrongdoing in a RICO suit do not carry with them the threat of future harm and generally do not extend the duration of the underlying scheme. *See Midw. Grinding*, 976 F.2d at 1024 (citing *Aldridge v. Lily-Tulip, Inc.*, 953 F.2d 587, 593-94 (11th Cir. 1992); *Pyramid Sec., Ltd. v. IB Resolution, Inc.*, 924 F.2d

(continued...)

*Whitmore's*, 424 F.3d at 674 ("[Plaintiff] pleaded himself out of showing a continuing threat of continued activity, because the alleged scheme had a natural ending point . . . .") (discussing open-ended continuity in summary judgment context); *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990) (defendants entitled to summary judgment in part because "the undisputed evidence" showed that "the scheme . . . had a natural ending with no threat of continued criminal activity"). Furthermore, on top of the confining nature of the amended complaint's allegations is the complete absence of any basis to suggest misconduct beyond the bounds of this one murder investigation or to otherwise indicate that the detectives have repeated or will repeat their alleged unlawful behavior.[3] *Cf. Roger Whitmore's*, 424 F.3d at 674 (discussing, in the summary judgment context, the lack of any indication that defendants had engaged in any other misconduct before or after the closed-period scheme at issue). As the district court stated, when granting the detectives' § 1292(b) motion, the "[amended] complaint does not permit the suggestion that Defendants intended to or threatened to commit similar acts in future investigations."

Despite this inherent lack of a threat of future/habitual criminal activity, the district court concluded that the

_____

(...continued)
1114, 1117 (D.C. Cir. 1991)).

[3] At oral argument, Gamboa's attorney acknowledged that the amended complaint is silent in this regard because he does not have the necessary factual/evidentiary basis, under the strictures of Fed. R. Civ. P. 11(b)(3), to make any such further allegations of wrongdoing (e.g., that these detectives engaged in frame-ups as a matter of course; that they have conducted other such malicious investigations).

amended complaint sufficiently alleged continuity because the detectives' one-shot scheme took several years, involved a variety of criminal acts, and targeted multiple victims. While such factors are generally helpful in assessing continuity, *see Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986),[4] we have cautioned that courts "are to apply these factors with an eye toward achieving a 'natural and commonsense' result, recognizing that 'Congress was concerned in RICO with long-term criminal conduct.'" *Vicom, Inc. v. Harbridge Merchant Servs. Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) (quoting *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1267 (7th Cir. 1990) (quoting *H.J. Inc.*, 492 U.S. at 237)); *see also Roger Whitmore's*, 424 F.3d at 673-74.

The district court erred in allowing the factors to over-ride the big picture. Since, as the district court correctly recognized, the amended complaint's allegations foreclosed any threat of continued criminal activity, the natural and commonsense result here is dismissal—the amended complaint cannot support the continuity element.[5] Restated,

---

[4] In *Morgan*, we stated that "[r]elevant factors" in the continuity analysis "include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." 804 F.2d at 975.

[5] To its credit, the district court rightly recognized, upon further reflection, that it had reached a counterintuitive result (finding continuity when continuity was not alleged). In a status conference after its Rule 12(b)(6) ruling, the district court observed: "[T]he thought occurred to me . . . when I read about what I had rendered in the *Chicago Lawyer* and how they discussed how it was[,] I don't want to say groundbreaking, but perhaps bizarre is the word. The question that occurred to me

(continued...)

when, as here, a complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim. *See Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 662-63 (7th Cir. 1992) (failure to state a RICO claim even though defendants' alleged scheme "extended over a period of years," involved multiple fraudulent acts, and injured more than one victim); *see also W. Assocs. Ltd. P'ship. v. Mkt. Square Assocs.*, 235 F.3d 629, 633-37 (D.C. Cir. 2001) (dismissal of complaint affirmed because alleged scheme, while lasting some eight years, was merely a single effort and thus failed to satisfy the pattern element); *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 13, 17-21 (1st Cir. 2000) (failure to state a RICO claim—failure to alleged the necessary pattern—because "the acts as alleged comprise a single effort, over a finite period of time"); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263, 1265 (D.C. Cir. 1995) (dismissal of RICO claim upheld, concluding that, even though the alleged scheme lasted some three years, it was "virtually impossible for plaintiffs to state a RICO claim" where they alleged a single-purpose scheme with a discrete injury suffered by a small number of victims); *cf. Roger Whitmore's*, 424 F.3d at 673 (summary judgment setting) ("Perhaps the most important element of RICO continuity is its temporal aspect. Although we have not

---

(...continued)
is whether or not the City wants to make a motion to seek an interim appeal of this under [§]1292(b). . . ." R.53-2.

employed a bright-line rule for how long a closed period must be to satisfy continuity, we have not hesitated to find that closed periods of several months to *several years* did not qualify as 'substantial' enough to satisfy continuity." (emphasis added) (citing *Midw. Grinding*, 976 F.2d at 1024)).

We briefly add that this conclusion makes particular sense in the context of a frame-up claim against police detectives. An innate part of our legal system is that some criminal defendants are acquitted, and some of those acquitted may have causes of action under state tort law and/or federal civil rights law. Here, Gamboa's state and other federal causes of action appear to be time- barred. However, that does not mean, as Gamboa would have it, that we should reformulate the law so as to indirectly revive other untimely claims. RICO is not a substitute for every time-barred tort or civil rights action. *See Corley*, 388 F.3d at 1002 ("In *H.J., Inc.*, the Supreme Court 'attempted to give definition to the pattern requirement to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden variety fraud actions properly brought under state law.'" (quoting *Midw. Grinding*, 976 F.2d at 1022)). As we have previously observed:

> [C]ivil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions. While it is clear that the scope of civil RICO extends beyond the prototypical mobster or organized crime syndicate, it is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour.

*Midw. Grinding*, 976 F.2d at 1025 (citations omitted). While we have previously addressed such misuse of RICO in the business fraud context, *see, e.g.*, *id.* at 1022, 1025, the reason-

ing applies with equal force here. RICO demands more than a straightforward case of malicious prosecution (such as the case before us) to open up its window to treble damages. While we do not intend to minimize Gamboa's case by labeling it "garden variety," it is not uncommon for a criminal investigation to develop over the course of several years. Further, many investigations involve a variety of police activities and result in charges against multiple defendants. Under the district court's approach, the presence of three such commonplace occurrences would satisfy § 1962(c)'s continuity requirement and thereby routinely enable the conversion of malicious prosecution claims into RICO claims. That is too broad a brush given RICO's limited concern of punishing organized and habitual criminal conduct. *Cf. Evans v. City of Chicago*, 434 F.3d 916, 928 n.23 (7th Cir. 2006) (generally observing that "[i]t is unlikely that [Congress] would have had the foresight to see [RICO] being utilized in an action against a municipality or its police officers. . . .").

## III.

Gamboa's amended complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and does not otherwise provide an indication that the detectives here have engaged or will engage in similar misconduct. As a consequence, the wrongdoing alleged, even when accepted as true, cannot amount to or pose a threat of continued criminal activity. Thus, for the reasons stated above, the amended complaint does not state a RICO claim under § 1962(c). Accordingly, we REVERSE and REMAND the case for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*