The BANKRUPTCY ESTATE OF KDC, INC. by its Trustee, James W. McNEILLY, Jr., Plaintiff,

v.

Harry KRAKLOW, Cynthia Kandler, Donald Johnson, Jeffrey Covelli, Kenneth Banwart, Darren Massner, Kim Myers, First Products, Inc. and Country Maid, Inc., Defendants.

No. 06–C–402–C.

United States District Court, W.D. Wisconsin.

May 9, 2007.

Dennis M. Sullivan, Herrick & Hart S.C., Eau Claire, WI, for Plaintiff.

Gary R. McCartan, McCartan Law Firm, S.C., Wausau, WI, Defendants Cynthia Kandler, Harry Kraklow.

Robert B. Corris, Robert B. Corris, S.C., Hartland, WI, for Defendants First Products, Inc., Donald Johnson.

Michael T. Schoendorf, Schoendorf Law Office, LLC, Waukesha, WI, Thomas G. Halloran, Garvey, McNeil & McGillivray, Madison, WI, for Defendant Jeffrey Covelli.

John B. Tuffnell, Whyte Hirschboeck Dudek S.C., Milwaukee, WI, Michael Thrall, Nyemaster, Goode, West, Hansell, Des Moines, IA, for Kenneth Banwart, Country Maid, Inc., Darren Massner.

OPINION and ORDER

BARBARA B. CRABB, District Judge.

This is a civil action for monetary relief. Plaintiff Bankruptcy Estate of KDC, Inc. contends that defendants Harry Kraklow, Cynthia Kandler, Donald Johnson, Jeffrey Covelli, Kenneth Banwart, Darren Mass-

ner and Kim Myers violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961–68, and that these defendants, along with defendants First Products, Inc. and Country Maid, Inc. committed violations of Wisconsin common law and a host of Wisconsin statutes. Jurisdiction is present under 28 U.S.C. §§ 1331, 1334(b).

Now before the court are three motions, including a motion for summary judgment by defendants First Products, Johnson, Covelli and Myers (I will refer to them as "the First Products defendants" when discussing them in the collective), a motion for summary judgment by defendants Country Maid, Massner and Banwart (whom I will refer to as "the Country Maid defendants") and a motion for partial summary judgment by plaintiff. I find that plaintiff is not barred by the doctrine of claim preclusion from pursuing its claims against defendants; therefore, the motion for summary judgment of the First Products defendants will be denied in this regard. The motions of the First Products and Country Maid defendants will be granted with respect to plaintiff's RICO claims because plaintiff has failed to adduce facts from which a reasonable jury could conclude that defendants engaged in a "pattern of racketeering activity" in violation of RICO. For the same reason, on the court's own motion, plaintiff's RICO claims against defendants Kraklow and Kandler will be dismissed as well. Finally, because no federal claims will remain in this case, plaintiff's remaining state law claims will be remanded for further consideration by the Circuit Court for Eau Claire County, Wisconsin.

From the findings of fact proposed by the parties, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. *Parties*

Defendant Harry Kraklow, along with two other founders, established KDC in 1996. They incorporated KDC in Wisconsin at that time; however, the corporation had no sales or income until it began operation in late 2000 or 2001. KDC's principal place of business was in Eau Claire, Wisconsin. KDC's goal was to create "convenient world class baking products" and manufacturing techniques to be licensed in domestic and international markets. While working with KDC, defendant Kraklow, along with defendant Cynthia Kandler, developed two baking products for which KDC filed patent applications: a shelf stable-sweet dough and a microwaveable frozen bread dough. The "shelf-stable sweet dough" was ready-to-bake cookie dough that does not require refrigeration. The "microwavable bread dough" was a frozen dough that rises, browns and bakes in a microwave; it can be wrapped around a filling to create a microwavable sandwich.

Defendant Kraklow was an officer and director of KDC. Defendant Kandler assisted defendant Kraklow in developing dough technology for KDC. Defendant Don Johnson served as KDC's "Chief Financial Officer" on a part-time basis from March 1, 2004 until he resigned in September or October, 2004. Thereafter, he was a consultant for KDC. Defendant Kim Myers was KDC's office manager. Defendant Johnson and defendant Jeff Covelli are shareholders and directors of defendant First Products, a company incorporated in Minnesota.

Defendant Country Maid is incorporated in Iowa and located in West Bend, Iowa. It manufactures bakery products, which it sells through dealers to church groups, schools and other non-profit groups for their fundraising efforts. Defendant Da-

rin Massner is the chief operating officer for defendant Country Maid and was in charge of the shelf-stable cookie dough project. Defendant Ken Banwart founded defendant Country Maid and is the chief executive officer.

### B. KDC's Operations

KDC's baking products never generated a profit, nor did it have many customers. Even after KDC began operations, it generated little revenue and relied on investment capital and loans to pay operating expenses. From January 2003 until May 2003, KDC received revenue from license agreements with three customers: defendant Country Maid, Cookies on Demand and International Multifoods. In May 2003, after paying KDC $10,000, International Multifoods ended its relationship with KDC. In July 2004, Cookies on Demand signed an amended licensing agreement, in which it agreed to pay KDC $6,000 a month. However, Cookies on Demand was consistently late in making payments to KDC and it is unclear whether it made its scheduled payments. KDC was unsuccessful in reaching licensing agreements with other customers, although several expressed interest in KDC's products.

Defendant Country Maid was KDC's largest customer. In May 2003, it entered into a licensing and confidentiality agreement with KDC. The agreement allowed defendant Country Maid to manufacture and sell shelf-stable cookie dough, a right for which it paid KDC a royalty fee. KDC and defendant Country Maid amended their agreement in May 2004. Under the amended agreement, defendant Country Maid agreed to pay KDC a minimum monthly royalty payment of $19,500 over the five-year term of the contract. In addition to the licensing agreement between the companies, Country Maid employees also bought shares of KDC stock. Defendants Massner and Banwart each purchased several thousand dollars of KDC stock and defendant Banwart served on the KDC board of directors between September 30, 2003 and May 26, 2004.

On March 1, 2004, KDC hired defendant Don Johnson as its "Chief Financial Officer." Among other assignments, defendant Johnson was responsible for creating a new operating business plan and for raising capital by directing the sale of $600,000 in KDC stock. He negotiated the amended licensing agreements with Cookies on Demand and defendant Country Maid that provided KDC with minimum monthly licensing payments.

On May 26, 2004, KDC's board of directors met. At the time, there were seven directors, including defendants Kraklow, Kandler and Banwart. The other four directors were Jerry Brosteau, Alan Clark, Karen McCabe, defendant Kandler's sister, and Stan Popko, who was not present. Early in the meeting, defendant Kraklow made motion to remove Popko from the board, which was approved unanimously. Defendant Johnson, who attended the meeting as a guest of the board, advised the board of their fiduciary duties and stated that, "given the way the company had been run in the past and the Wanke lawsuit, he would not want to be on the board." ("The Wanke lawsuit" to which he referred was a lawsuit filed by Rick Wanke, a KDC shareholder who was pursuing a lawsuit against KDC in which he contended that KDC owed his company, Appraisal Excellence, Ltd., $176,000 for professional services.)

Banwart, Brosteau, Clark and McCabe all resigned from the board. Banwart states that he resigned because defendant Kraklow or Johnson advised him that "things could get 'messy'" and that they thought it would be better if he didn't know what was going on. KDC's bylaws required three directors; several days later McCabe rejoined the board. Defen-

dants Kandler and Kraklow were KDC's only corporate officers; defendant Kraklow was the president and co-treasurer and defendant Kandler was the secretary.

Throughout the summer of 2004, defendant Johnson attempted to raise capital for KDC from outside investors, but his efforts did not yield results. On July 1, 2004, defendants Johnson, Kandler and Myers bought KDC stock for $.01 a share. Defendant Johnson bought 500,000 shares and defendants Kandler and Myers bought 250,000 shares. At the time, other investors were paying $1.00 a share for the stock, including defendant Covelli, who bought 5,000 shares for $5,000. (The parties have not provided information regarding the number of shares outstanding after these sales.)

KDC had a business loan from Citizens State Bank of Cadott for $121,963.15, which was due in full on July 14, 2004. It bore an interest rate of 7% and KDC was required to make interest payments only until the note came due. KDC neither paid nor renewed the loan in July.

In a letter dated August or September 14, 2004, defendant Johnson notified defendant Kraklow that he planned to quit KDC. (The parties have produced two letters that are identical, except for their dates and the dates they give for defendant Johnson's effective resignation.) After his resignation (on either September 4 or October 4, depending on which letter is correct), defendant Johnson remained on KDC's payroll, at his full salary, as a "consultant," until November 5, 2004.

In a letter dated September 10, 2004, but not sent until approximately September 28, 2004, defendant Country Maid stated that it intended to discontinue its licensing agreement with KDC. In a letter dated September 14, 2004, but not written or sent until after October 20, 2004, KDC agreed to the termination of the licensing agreement. The letter appears to be signed by defendant Kraklow. (However, he denies writing the letter or agreeing to terminate the contract with defendant Country Maid.) At this time, defendant Banwart believed that KDC was insolvent or "heading into bankruptcy."

On October 4, 2004, KDC held an emergency shareholders meeting. According to the meeting agenda, KDC had no contracts, the business loan from Citizens State Bank of Cadott was in default and a prior offer from defendant Covelli for financial assistance to KDC had been withdrawn. On October 22, 2004, Wanke purchased KDC's outstanding business loan from Citizens State Bank of Cadott, which was in default.

KDC shareholders met on October 26, 2004. At that meeting, defendant Johnson made a motion to dissolve KDC, which passed. The shareholders agreed to hold another meeting on November 8, 2004 to take a second vote on dissolution. KDC ceased operations on November 5, 2004.

### C. Establishment of Defendant First Products

On September 20, 2004, defendants Massner, Banwart, Johnson and Covelli met to discuss the possibility of Covelli's starting a new company that would license KDC's technology to defendant Country Maid. Defendant Country Maid had cookie dough sales contracts that it needed to fulfill and wanted to ensure that its supply was not interrupted. Defendant Covelli controlled a company called MGB and was interested in purchasing KDC's assets, including its dough manufacturing processes, which it was licensing to defendant Country Maid.

On September 29, 2004, defendant Johnson filed articles of incorporation in Minnesota to establish defendant First Products. Sometime in November 2004, defendants Kraklow and Kandler began working for defendant First Products. On November

15, 2004, defendant Covelli's company, MGB Financial, an affiliate of defendant First Products, made an offer to purchase the assets of KDC for $157,000. The KDC board of directors, including defendants Kraklow and Kandler, accepted this offer. On November 30, 2004, defendants First Products and defendant Country Maid entered into a licensing agreement for KDC's cookie dough technology. Between November 2004 and January 2005, defendant First Products received payments of $78,000 from defendant Country Maid.

### D. *Second Wanke Lawsuit*

On November 4, 2004, Wanke filed an action against defendants KDC and Kraklow, as well as KDC's two other founders, to foreclose on assets that secured the note he had purchased from Citizens State Bank of Cadott. On November 12, 2004, a group of eighteen KDC shareholders, including Wanke and Stan Popko, a shareholder and former KDC employee, filed a "Derivative Action for Breach of Fiduciary Duties" on behalf of KDC in the Circuit Court for Eau Claire County, Wisconsin. It named as defendants Kraklow and Kandler and included two claims: breach of fiduciary duty and misrepresentation. On November 22, 2004, the court entered an order in the foreclosure action that a receiver should be appointed to preserve KDC's assets. On December 16, 2004, Melvyn Hoffman was appointed receiver.

### E. *KDC's Bankruptcy Proceeding*

On December 21, 2004, KDC filed a voluntary bankruptcy petition with the United States Bankruptcy Court for the Western District of Wisconsin, pursuant to Chapter 11 of the United States Bankruptcy Code. Defendant Kraklow signed the petition on behalf of KDC.

The following day, Hoffman filed a motion to dismiss the bankruptcy case or have the bankruptcy court abstain from hearing the case, arguing that the bankruptcy filing had been made in bad faith.

On December 29, 2004, Hoffman submitted a supplemental affidavit, alleging fraud in the filing of the bankruptcy petition. In that affidavit, he alleged that (1) KDC stock was improperly issued to defendants Johnson, Kandler, Myers and Covelli as part of a conspiracy to "obtain control of the enterprise"; (2) KDC and defendant Kraklow "unilaterally accepted the request of Country Maid, Inc., a contractually obligated customer, to cancel the contract between the two companies which was, at the time, the principal source of revenue to the company, providing approximately $19,500 per month"; and (3) KDC's decision to file its bankruptcy petition was improper because of defendants Kraklow and Kandler's involvement with defendant First Products, which Hoffman alleged "was organized specifically to take advantage of corporate opportunities (the potential purchase of the company) owed to KDC Foods, Inc., through the use of intellectual property assets belonging to KDC Foods, Inc. or to which KDC Foods, Inc. is rightfully entitled (patent rights, customer lists and contracts)."

KDC opposed Hoffman's motion and argued that the bankruptcy petition had been filed in good faith and was in the best interest of all of KDC's creditors. On January 26, KDC and Hoffman entered a stipulation that resolved Hoffman's motion to dismiss. One aspect of the stipulation was the appointment of a "neutral third party" Chief Restructuring Officer.

On February 7, 2005, Stan Popko, a shareholder and plaintiff in the shareholder derivative action, and a former KDC employee, wrote to the bankruptcy court, objecting to the appointment of John Paprocki as the chief restructuring officer and alleging that fraud had occurred in the termination of KDC's contract with defendant Country Maid. He demanded that a committee of unsecured creditors be ap-

pointed. On February 14, 2005, KDC filed a motion requesting that the bankruptcy court enter an order "authorizing and approving the sale of specified assets" to defendant First Products or another buyer through a bidding process. On February 28, 2005, the United States Trustee notified the parties that an unsecured creditors committee had been appointed. The members of the committee included Popko, Dervetski and the Lyden Company.

On March 1, 2005, Wanke filed an objection to KDC's motion to establish sales procedures for an auction of KDC's assets. He complained that defendant First Products was "comprised of insiders [of KDC]" and that the bidding procedures were unfair to potential bidders who were not KDC insiders. On March 4, Popko also filed an objection to the sales procedures motion, on behalf of himself and the unsecured creditors committee. In the objection, he asserted that "First Products appears to consist of individuals associated with ownership and management of the Debtor. The proposal appears to be an attempt to quickly transfer all assets from Debtor to a group of insiders at a favorable price by eliminating unsecured debt and improperly removing successor liability" and that the minimum acceptable bid was too low. On March 4, 2005 the attorney for the unsecured creditors committee also filed an objection to the sales procedure.

On March 7, 2005, the court held a hearing on the objections to the proposed sales procedures. Wanke, Popko, Dervetski, the unsecured creditors committee and the U.S. Trustee were present or represented at the hearing. On March 8, 2005, the court entered a Sales Procedures Order, in which it found that the sales procedures requested were in the "best interests of [KDC], [KDC's] estate and creditors and other parties in interest." The March 8, 2005 order scheduled an auction

of KDC's assets for the morning of April 7, 2005 and set out the procedures governing the auction. Defendant First Products was the successful bidder for the assets. Later that day, the bankruptcy court held a hearing to determine whether the sale to defendant First Products should be approved. On April 15, 2005, the bankruptcy court issued an order, finding that defendant First Products was a "good faith purchaser as required by 11 U.S.C. § 363(m)" and that the asset sale was "in the best interests of the [Debtor in Possession's] bankruptcy estate and its creditors." The court overruled on the merits the objections to KDC's February 14, 2005 motion for approval of the sales processes.

The April 15 order specified that all of KDC's assets would be transferred to defendant First Products free of claims or liabilities "arising under or out of, in connection with, or in any way relating to the [Debtor in Possession], the Assets, the operation of the [Debtor in Possession's] business prior to the Closing Date, or the transfer of Assets to Buyer." However, the order also provided that "permitted encumbrances as agreed to by the parties and any liabilities which Buyer expressly assumes under the sale to Buyer" would be excluded from these limits on liability. Finally, the order stated that:

> In addition to the terms of the Asset Purchase Agreement, attached hereto, that limit the transfer of certain claims to the Buyer, any claim the [Debtor in Possession] has against Country Maid, Inc., or any other entities, for the use of the [Debtor in Possession's] intellectual property up to the Closing Date will remain property of the Bankruptcy Estate and, therefore, will not be sold to Buyer.

On April 18, 2005, defendant First Products completed its purchase of KDC's assets. The parties signed an asset pur-

chase agreement that specified the terms of the purchase. Pursuant to that agreement, defendant First Products purchased from KDC the following intangible assets:

All of Seller's customer lists, patents, patent applications, formulations, licenses, trade names, trade dress, trademarks, service marks, copyrights, goodwill, government approvals, permits and authorizations (and any applications for any of the foregoing) and all technical know-how, trade secrets, designs, specifications, confidential information and other similar intangible assets, all computer software and any other intellectual property owned by Seller, all as described more fully on Schedule 1(b) hereto (the "Intangible Assets").

Under the heading "Assets Excluded From Sale," the agreement states:

The assets of Seller described below shall be excluded from transfer under this Agreement.

. . . .

(b) *Causes of Action.* All causes of action and claims, including, without limitation, causes of action under sections 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code and the shareholder derivative action currently pending in Eau Claire County Court (designated Case No. 04–CV–742), but excluding causes of action directly related to any of the Purchased Assets[.]

At the closing of the transaction on April 18, 2005, KDC delivered to First Products an Assignment that assigned to First Products "all right, title and interest it has in any and all Confidentiality Agreements that are property of the Seller's bankruptcy estate . . . ."

### F. *The Present Lawsuit*

In July 2005, the KDC bankruptcy was converted from a Chapter 11 reorganization to a liquidation proceeding under Chapter 7 of the bankruptcy code. James McNeilly was appointed trustee of the bankruptcy estate. On January 18, 2006, the trustee filed an application with the bankruptcy court to employ a lawyer to represent KDC. The application stated

[A]mongst the matters remaining to be administered in the above entitled case is a claim represented by a stockholders derivative suit entitled *Bandholz et al v.[K]andler, et al,* Eau Claire County Case Number 04CV742. That said case was originally filed with the court on the 12th day of November, 2004 and prior to the filing of the Chapter 11 bankruptcy proceeding.

In the application, the trustee specified that any recovery of money would be distributed evenly between "the stockholders who are plaintiff at the time of the recovery pursuant to their individual agreement as to the distribution of those funds" and "the bankruptcy estate of KDC Foods, Inc." The bankruptcy court approved the application for employment of counsel on January 20, 2006.

On June 27, 2006, plaintiff filed an "amended complaint" in case number 04–CV–742 in the Circuit Court for Eau Claire County. The amended complaint included claims brought under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68. On July 27, 2006, defendants removed the case to this court pursuant to 28 U.S.C. § 1331.

### OPINION

As noted above, there are three separate motions for summary judgment currently before the court. The First Products defendants assert that the court need not reach the merits of plaintiff's claims because those claims are barred by the doctrine of claim preclusion. Both the First Products defendants and the Country Maid defendants contend that plaintiff has not adduced facts sufficient to sustain its RICO claims against them.

## A. Claim Preclusion Related to Bankruptcy Proceedings

The First Products defendants have moved for summary judgment on all of plaintiff's claims against them. They argue that both the importance of finality in bankruptcy sales and the doctrine of claim preclusion bar consideration of plaintiff's claims in this proceeding because many of the underlying allegations were raised before the bankruptcy court, prior to its approval of the sale of KDC's assets to defendant First Products. They assert that, in approving the asset sale, the bankruptcy court resolved these claims implicitly. Defendants intermingle these arguments, but they are analytically distinct and I have considered them separately.

■ Defendants rely heavily on the Court of Appeals for the Seventh Circuit's decision in *In re Met–L–Wood Corp.*, 861 F.2d 1012 (7th Cir.1988), to support their argument that plaintiff's claims are barred generally by the need for finality in bankruptcy sales. In *Met–L–Wood*, the plaintiffs contended that the defendants had engaged in "skullduggery" during a bankruptcy proceeding by having *ex parte* communications with the bankruptcy judge and rigging the bidding process for the sale of the debtor's assets. *Id.* at 1015. Rather than appealing the bankruptcy judge's approval of the asset sale, the plaintiffs chose to file a separate action in federal court. *Id.* at 1016. The court of appeals rejected the plaintiffs' claims, holding that they were barred by claim preclusion and noting the pragmatic need for finality in the sale of a debtor's assets in bankruptcy. *Id.* at 1016–17. Although the opinion does include several broad statements about the value of finality in bankruptcy sales, the holding is narrower than defendants suggest. Put simply, the court of appeals took the position that parties may not mount a collateral attack on a bankruptcy sale on the ground that there was something improper about the proceedings. *Id.* at 1016, 1018. The proper avenue for such a challenge is a timely filed appeal. *Id.*

To the extent *Met–L–Wood* controls the outcome here, most aspects of the present action are readily distinguishable. Plaintiff is not challenging defendant First Products' ownership of KDC's assets, and most of its allegations do not relate to any "skullduggery" in the bankruptcy proceedings themselves. Instead, the majority of plaintiff's claims relate to behavior by defendants *prior* to KDC's bankruptcy. For example, plaintiff alleges that defendants Johnson and Myers breached their fiduciary duties and their contracts while they were employed by KDC. These claims could not have arisen from conduct during the bankruptcy proceedings because defendants Johnson and Myers were no longer employed by KDC when it entered bankruptcy. Likewise, plaintiff alleges that the First Products defendants tortiously interfered with KDC's contract with defendant Country Maid. According to plaintiff, this interference caused defendant Country Maid to end its contractual relationship with KDC in September 2004 and establish a new contract with defendant First Products in November 2004; KDC did not file its bankruptcy petition until December 2004. Plaintiff is not attempting to attack the proceeding that led to the sale of KDC's assets to defendant First Products, but instead to create value from as many assets for the estate as possible.

It is true that some of plaintiff's conspiracy allegations in its complaint appear to relate to defendants' actions in the bankruptcy proceedings. To the extent plaintiff seeks to pursue these claims, they would be barred under the reasoning of *Met–L–Wood*. However, in response to defendants' motion for summary judgment,

plaintiff argues that it is not challenging the bankruptcy proceeding at all, and I will take it at its word. As will be discussed in greater detail below, plaintiff's disclaimer of any allegations related to defendants' allegedly untoward behavior in the bankruptcy proceedings has implications for its RICO and other conspiracy claims.

The First Products defendants go on to discuss in great detail two older cases from the Court of Appeals for the Fifth Circuit, *Hendrick v. H.E. Avent*, 891 F.2d 583 (5th Cir.1990), *Southmark Properties v. Charles House Corp.*, 742 F.2d 862 (5th Cir.1984), and an unpublished case from the Bankruptcy Court for the District of Delaware, *Temtechco, Inc. v. CIBC Wood Gundy Ventures, Inc.*, No. 95–00596, 99–00077, 1998 WL 887256 (Bankr.D.Del. Dec. 18, 1998), to support their position that the need for finality in bankruptcy proceedings is an independent reason to reject plaintiff's claims. These cases are not precedential and are of limited persuasive value. They were highly fact-specific determinations in which the courts determined that the defendants' pre-bankruptcy actions were so intertwined with questions related to the ownership of assets sold in bankruptcy that the bankruptcy sale constituted a final judgment with respect to those claims as well. As discussed above, the claims in this case are not so closely intertwined. It would be possible to believe both that defendant First Products purchased KDC's assets in good faith in April 2005, and that defendants Myers and Johnson breached their fiduciary duties to KDC in the summer of 2004. (I offer this as an example only and make no determinations about whether defendants Myers and Johnson had such duties, or if they did, whether they breached them.) Finally, it is not unusual for claims that arise from pre-bankruptcy conduct to be considered separately from a bankruptcy action. *See, e.g., Good v. Voest–Alpine Industries*,

398 F.3d 918, (7th Cir.2005) (upholding remand of breach of contract and constructive fraud claims for state court determination while bankruptcy action proceeded separately and noting result was "not particularly unusual or onerous"). It is difficult to imagine that this would be an accepted or sensible practice if bankruptcy proceedings always have the preclusive effect the First Products defendants suggest they do.

I turn next to the First Products defendants' claim preclusion argument. Under the doctrine of claim preclusion, or res judicata, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Highway J Citizens Group v. United States Dept. of Transportation*, 456 F.3d 734, 741 (7th Cir.2006) (quoting *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). The federal rule of claim preclusion governs here, because the allegedly preclusive action was brought in federal court. *Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir.2002).

Claim preclusion bars a subsequent suit if the claim upon which the suit is based arises from the "same incident, events, transaction, circumstances, or other factual nebula" as a prior suit that has gone to final judgment. *Okoro v. Bohman*, 164 F.3d 1059, 1062 (7th Cir.1999). The three requirements for claim preclusion under federal law are "(1) an identity of the parties or their privies; (2) an identity of the causes of actions; and (3) a final judgment on the merits." *Id.* Claim preclusion is an affirmative defense. *Rizzo v. Sheahan*, 266 F.3d 705, 714 (7th Cir.2001). Therefore, to prevail on a motion for summary judgment, the party with the burden of proof must establish each element of

780

claim preclusion as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The First Products defendants' argument about claim preclusion is somewhat difficult to follow. However, it is clear that the parties do not dispute whether the parties to the bankruptcy proceeding and this lawsuit are identical or whether the bankruptcy court's approval of the sale of KDC's assets to defendant First Products represented "a final judgment on the merits." A bankruptcy court's order approving the sale of a debtor's assets is a final adjudication regarding ownership rights. *E.g., La Preferida, Inc. v. Cerveceria Modelo*, 914 F.2d 900, 908 (7th Cir.1990). The parties appear to dispute only whether the claims raised in the bankruptcy proceeding and this lawsuit are identical.

■ The First Products defendants assert that the objections raised by Wanke and Popko to the proposed sales procedures for KDC's assets are identical to plaintiff's present claims under "RICO, other statutes, and common law provisions." A claim has "identity with a previously litigated matter" even when the legal elements are distinct, if it arises from the same "core of operative facts." *Brzostowski v. Laidlaw Waste Systems*, 49 F.3d 337, 339 (7th Cir.1995) (quoting *Colonial Penn Life Insurance Co. v. Hallmark Insurance Administrators, Inc.*, 31 F.3d 445, 447 (7th Cir.1994)). Therefore, it is necessary to consider what "core of operative facts" is related to Wanke's and Popko's objections to the sales procedures. Wanke's March 1, 2005 objection to KDC's motion to establish sales procedures was that defendant First Products was "comprised of insiders [of KDC]" and that the bidding procedures were unfair to potential bidders who were not KDC insiders. In Popko's March 4, 2005 objection, on behalf of himself and the unsecured credi-

tors committee, he asserted that "First Products appears to consist of individuals associated with ownership and management of the Debtor"; "the proposal appears to be an attempt to quickly transfer all assets from Debtor to a group of insiders at a favorable price by eliminating unsecured debt and improperly removing successor liability"; and the minimum acceptable bid was too low. The bankruptcy court approved the sales procedure over these objections.

■ Wanke's and Popko's "claims" relate to defendants' activities in the bankruptcy proceeding, which they contend were unfair. Therefore, to the extent plaintiff is attempting to relitigate matters related to the legitimacy of the asset sale, these claims are precluded because they could have been and in fact were raised prior to the bankruptcy court's approval of the sale. Had plaintiff asserted a claim of bankruptcy fraud in this lawsuit or argued that it was the true owner of some of the assets sold in the bankruptcy sale, such claims would be likely to be barred as a matter of law by claim preclusion. However, none of the claims plaintiff asserts in this lawsuit are barred in their entirety by this determination because all relate, in large part, to acts that preceded KDC's bankruptcy filing and thus stem from a different "core of operative facts" from those supporting the objections raised before the bankruptcy court by Wanke and Popko. When it comes time to evaluate each of plaintiff's claims, it will be necessary to determine whether plaintiff can prove all elements of each claim without relying on facts related to the bankruptcy proceedings. If it cannot make such a showing as to a particular claim, it will be barred from pursuing that claim.

Finally, the First Products defendants argue the preclusive effects of the objections to KDC's bankruptcy filing that were

raised by Hoffman. However, defendants have not briefed the question whether the stipulation that resolved these objections was a final judgment (and, from the facts the parties have proposed, it appears that it was not). If the stipulation was not a final judgment, claim preclusion does not apply. It is an affirmative defense, so defendants bear the burden of showing that they can prevail as a matter of law with respect to each element. Because they have not met that burden, this portion of their motion for summary judgment will be denied.

## B. *RICO Claims*

Next, plaintiff contends that defendants Kraklow, Kandler, Johnson, Covelli, Massner, Banwart and Myers engaged in activities that violated the federal Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961–68. Before discussing this issue, it is necessary to consider the Country Maid defendants' argument that plaintiff lacks standing to assert RICO claims against defendants Banwart and Massner. They contend that the asset purchase agreement between defendant First Products and KDC effectuated an assignment to defendant First Products of the RICO claims plaintiff now asserts against Banwart and Massner because these claims are "related to" the assets transferred in the sale and were therefore excluded from the exclusion from sale "all causes of action and claims. ..." It is questionable whether this is true, given the asset purchase agreement's broad language and narrow exclusion. Moreover, defendants have not explained how the RICO claims are "related to" the purchased assets. (The entire argument appears to consist of a single sentence on page 12 of the Country Maid defendants' brief in support of their motion for summary judgment.) Arguments "not developed in any meaningful way are waived." *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999). Therefore, I will disregard this alleged assignment and consider the merits of plaintiff's RICO claims against defendants Banwart and Massner.

 Both the First Products defendants and the Country Maid defendants have moved for summary judgment on plaintiff's RICO claims. The parties' briefs do not focus on which subsections of the statute plaintiff alleges defendants violated. However, in its complaint, plaintiff alleges violations of § 1962(a), § 1962(b) and § 1962(c). Although each subsection has unique elements, a "pattern of racketeering activity" must exist to support a violation of any of the subsections. For example, the elements of a RICO violation under § 1962(c) are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

A "pattern of racketeering activity" consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Predicate acts are acts indictable under a specified list of criminal laws, 18 U.S.C. § 1961(1)(B), including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992).

Evaluating the merits of plaintiff's RICO claim is nearly impossible because plaintiff has not bothered to offer any analysis about how individual activities in which defendants allegedly engaged fit within the framework of RICO. Instead, it continues to rest on conclusory and vague allegations. It is telling that plaintiff does not even attempt to establish the elements of any "predicate act," or analyze whether the acts alleged satisfy these elements. In response to the motion for summary judgment of the First Products defendants,

plaintiff contends that defendant Johnson engaged in at least sixteen "predicate acts" after he was hired by KDC in March 2004. Some of these include:

- Orchestrating the mass resignations by the KDC board of directors to insulate them from claims of claims of breach of fiduciary duty when they became involved with First Products.
- "Using and abusing" his position of trust with KDC to orchestrate the transfer of KDC's contracts, cash and intellectual property to MGB or First Products.
- Failing to notify KDC's shareholders of his conflicted loyalty.
- Recruiting KDC's most valuable customer and business partner to conspire with him and MGB or First Products while continuing to "pose" as KDC's chief financial officer.
- Receiving and concealing payments from Country Maid to First Products that belonged to KDC.
- Arranging the sale of one million shares of KDC stock to himself Kandler and Myers at $0.01 per share, when others were paying $1.00 per share, and not revealing the sale to the KDC shareholders.
- Concealing and misrepresenting KDC's financial condition and options to its shareholders to achieve a quick dissolution of KDC and a quick sale of its assets to MGB or First Products.

Plaintiff further contends that defendants' "scheme" included the following acts: "they gained controlling interest in KDC by diluting others shares, they threatened other shareholders, they canceled contracts, they created false documents, they got the KDC assets on the auction block and they used the mail and wire to accomplish these things." I presume that plaintiff intends to allege that all of the RICO defendants engaged in these activities, though it has not stated this directly.

It is far from clear whether all of the activities included in these laundry lists of bad acts allegedly engaged in by defendants Johnson, Myers and Covelli qualify as predicate acts of racketeering under RICO. Plaintiff has not briefed this issue. However, I will make the generous assumption that somewhere within these lists lie two legitimate predicate acts of racketeering. (In its brief in opposition to the motion for summary judgment by the Country Maid defendants, plaintiff asserts that it was wire fraud for defendant Country Maid to fax the misdated September 14 letter that purported to terminate its agreement with KDC. Wire fraud is a "predicate act" under RICO. 18 U.S.C. § 1961. Plaintiff seems to forget that defendant Country Maid is not a defendant with respect to plaintiff's RICO claim.)

■ To demonstrate a "pattern of racketeering activity" under RICO, continuity of the alleged predicate acts is required. *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir.2006) ("the alleged acts of wrongdoing ... must 'amount to or pose a threat of continued criminal activity'") (citing *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1002 (7th Cir. 2004) (internal references omitted)). The United States Supreme Court has explained that "[a] party alleging a RICO violation may demonstrate continuity over a closed period by providing a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Thus, isolated instances of criminal behav-

ior, not presenting at least some threat of future harm, are not sufficiently "substantial" to demonstrate the requisite continuity. *Roger Whitmore's Automotive Services, Inc. v. Lake County, Illinois,* 424 F.3d 659, 673–74 (7th Cir.2005).

■ RICO prohibits racketeering schemes that are both closed and open-ended in nature. *Gamboa v. Velez,* 457 F.3d 703, 705–06 (7th Cir.2006). A closed-ended scheme is one in which criminal activity has ended, but that carries an implicit threat of future harm because of its duration. *Id.* at 705–06. An open-ended scheme may be short-lived, if, by its intrinsic nature, it threatens repetition. *Id.*

■ Although plaintiff argues that defendants' alleged scheme may be considered either open or closed-ended, both the facts and plaintiff's allegations demonstrate that, if a scheme occurred, it ended when defendants successfully gained control of KDC's assets. There is no evidence to suggest a threat of continued criminal activity by defendants. Thus, if defendants had a scheme, it was closed-ended in nature. Whether a particular closed-ended scheme satisfies RICO's continuity requirement is a fact-specific analysis. Relevant factors include "(1) the number and variety of predicate acts and the length of time over which they were committed, (2) the number of victims, (3) the presence of separate schemes, and (4) the occurrence of distinct injuries." *Roger Whitmore's Automotive Services, Inc.,* 424 F.3d at 673.

Although there is no bright line rule regarding the length of time over which conduct in a closed-ended scheme must occur, duration is one of the chief factors considered by courts when evaluating continuity. *Id.* (noting that court of appeals "has not hesitated to find that closed periods of several months or several years did not qualify as 'substantial' enough to satisfy continuity"). In *Midwest Grinding Co.,*

976 F.2d at 1023–24, the court of appeals found that a "one shot" scheme that lasted nine months was insubstantial. The court listed a number of cases in which closed-ended schemes that spanned four months to several years lacked continuity to support a finding of a "pattern" of RICO violations. *Id.*

Here, the earliest "predicate act" allegedly occurred on May 26, 2004, when defendants Johnson and Kraklow encouraged KDC board members to step down in order to gain control of the board (although how encouraging directors to resign constitutes an act of racketeering remains unclear). Plaintiff alleges that the letters between defendant Country Maid and KDC were falsified sometime in November 2004. As discussed above, to the extent plaintiff alleges that defendant First Products' purchase of KDC at auction in April 2005 was an act of bankruptcy fraud, this argument is barred by claim preclusion. Thus, viewing the evidence in the most generous manner possible to plaintiff, defendants engaged in a single scheme to gain control of KDC, drive it into the ground and purchase its assets for a reduced price. This scheme occurred over the course of seven months (when KDC entered bankruptcy) and allegedly harmed one group of victims: KDC's creditors.

Even if I draw all reasonable inferences in plaintiff's favor (and even if I drew a few less reasonable inferences), it is simply not plausible to infer that defendants' alleged acts were sufficiently substantial to demonstrate that they engaged in a pattern of racketeering activity. The acts occurred over a period of time that, in many other cases, the court of appeals has found insufficient to show continuity. Moreover, the number of predicate acts is limited and defendants' alleged scheme was directed toward achieving a single, specific outcome. Thus, there is no reason

to believe that this is an unusual situation in which the other favors weigh in favor of finding continuity despite the scheme's limited duration.

This is not to say that many of plaintiff's allegations are not troubling. They are. But, as a matter of law, they are not sufficient to sustain plaintiff' RICO claims because the duration of the alleged scheme was limited, had a single goal and a single group of victims. As a result, a reasonable jury could not conclude that defendants engaged in a "pattern of racketeering activity." Therefore, the motions for summary judgment of the First Products defendants and the Country Maid defendants will be granted with respect to plaintiff's RICO claims.

Defendants Kraklow and Kandler did not move for summary judgment on this or any of plaintiff's other claims. However, it is clear from the parties' filings that plaintiff contends that defendants Kraklow and Kandler participated in the same scheme as the other defendants. Because I have found as a matter of law that the alleged scheme did not amount to a "pattern of a racketeering activity," plaintiff's RICO claims against defendants Kraklow and Kandler will be dismissed on the court's own motion.

### C. Jurisdiction to Consider State Law Claims

Having dismissed plaintiff's sole federal claim, I must re-evaluate the propriety of retaining jurisdiction to consider plaintiff's remaining state law claims. Under 28 U.S.C. § 1334(b), this court has jurisdiction to hear "all civil proceedings ... related to a case under title 11." There is no question that plaintiff's remaining claims against defendants are assets of the bankruptcy estate and would return value to the estate if resolved in plaintiff's favor. 11 U.S.C. § 541(a)(1). Thus, they are "related to" KDC's ongoing bankruptcy proceeding. *Fisher v. Aposto-*

*lou,* 155 F.3d 876, 882 (7th Cir.1998) (claims that affect amount of property in estate or allocation of property among creditors "relate to" bankruptcy proceeding) (citing *Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159, 161–62 (7th Cir.1994), *In re Memorial Estates, Inc.,* 950 F.2d 1364, 1368 (7th Cir.1991); *In re Heath,* 115 F.3d 521, 524 (7th Cir.1997)). Therefore, this court has jurisdiction to hear the claims. However, under 28 U.S.C. § 1334(c)(1), a district court, "in the interest of justice, or in the interest of comity with State courts or respect for State law" may abstain from hearing claims that are "related to" a bankruptcy proceeding. All of plaintiff's remaining claims arise under the laws of the state of Wisconsin and, from the information provided, it appears that the parties are not diverse. To the extent the claims present novel questions about the application of Wisconsin law, there is little reason for this court to retain jurisdiction to hear them. I recognize that this case has been dragging on for some time and the parties have a strong interest in its expeditious resolution. However, because the lawyer for several defendants withdrew recently, there is no trial date scheduled in this court. Neither the interest of judicial efficiency nor speedy resolution of the claims overcomes the importance of Wisconsin courts interpreting the laws of their state. Therefore, I will not consider the additional claims included in defendants' motions for summary judgment or plaintiff's motion for summary judgment because the remaining issues arise solely under Wisconsin law.

### ORDER

IT IS ORDERED that

1. The motion for summary judgment of defendants First Products, Donald Johnson, Jeffrey Covelli and Kim Myers is

GRANTED IN PART and DENIED IN PART.

a. Defendants' motion is DENIED IN PART with respect to their assertion that the doctrine of claim preclusion bars plaintiff from pursuing the claims alleged in its amended complaint.

b. Defendants' motion is GRANTED IN PART with respect to plaintiff's claims under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961–68. Plaintiff's RICO claims against defendants Johnson, Covelli and Myers are DISMISSED.

2. The motion for summary judgment of defendants Country Maid, Kenneth Banwart and Darren Massner is GRANTED IN PART with respect to plaintiff's claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68. Plaintiff's RICO claims against defendants Banwart and Massner are DISMISSED.

3. On the court's own motion, plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68, against defendants Kraklow and Kandler are DISMISSED.

4. Pursuant to 28 U.S.C. § 1334(c)(1), the case is REMANDED to the Circuit Court for Eau Claire County, Wisconsin for further consideration of plaintiff's state law claims.

5. The clerk of court is directed to return the record in the case number 06–C–402–C to the Circuit Court for Eau Claire County, Wisconsin.